UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EARON LASHAWN TYLER,

      Petitioner,

v.                                  Case No.  2:24-cv-363-JLB-NPM

SECRETARY, DEPARTMENT OF
CORRECTIONS,

      Respondent.
_____/

## ORDER

This cause is before the Court on the amended pro se 28 U.S.C. § 2254 petition for habeas corpus relief filed by Earon Lashawn Tyler (Petitioner), a prisoner of the Florida Department of Corrections serving a life sentence for murder.  (Doc. 2.)   At the Court's direction (Doc. 11), Respondent filed a response (Doc. 16), and Petitioner filed a counseled reply.   (Doc. 25.)

Upon careful consideration of the pleadings, the state court record, and the entire file, the Court concludes that none of Petitioner's claims entitles him to federal habeas corpus relief.   Because the Court was able to resolve the petition on the record, an evidentiary hearing is not warranted.   See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

## I.    Background and Procedural History

This case involves the December 11, 1995 robbery of a supermarket that resulted in the shooting death of the store's owner.   (See Doc. 16-2 at 16–17.)   A jury convicted Petitioner of first-degree murder and attempted robbery with a

firearm.    (Doc. 16-3 at 2–3.)   The trial court sentenced Petitioner to life in prison without the possibility of parole on the murder charge and to a consecutive term of five years' imprisonment on the attempted robbery charge.   (Doc. 16-2 at 729; Doc. 16-3 at 5–14.)   Florida's Second District Court of Appeal (Second DCA) affirmed the convictions and sentences without a written opinion.   (Doc. 16-3 at 118.)

Thereafter, Petitioner filed a state petition for writ of habeas corpus alleging ineffective assistance of appellate counsel.   (Doc. 16-3 at 126–42.)   The Second DCA denied the petition without a written opinion.   (Id. at 317.)   Petitioner then filed a motion and an amended motion for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure (collectively, Rule 3.850 Motion).   (Id. at 319–61.)   The postconviction court denied all claims without holding an evidentiary hearing.   (Id. at 377–88.)   In a written opinion, the Second DCA reversed, in part, the postconviction court's ruling on four grounds and remanded for a hearing on those claims.   Tyler v. State, 793 So. 2d 137 (Fla. 2d DCA 2001); (Doc. 16-3 at 402–05.)   Following an evidentiary hearing, the postconviction court denied the remaining four claims.   (Doc. 16-4 at 2–4.)   The Second DCA affirmed without a written opinion.   (Id. at 106.)

On May 5, 2003, Petitioner filed another Rule 3.850 Motion alleging newly discovered evidence.   (Doc. 16-4 at 110–16.)   The postconviction court denied the claim (id. at 118–21), and the Second DCA affirmed without a written opinion.   (Id. at 201.)

Petitioner filed his first 28 U.S.C. § 2254 petition in this Court on June 23, 2004. (Doc. 16-4 at 211–52, MDFL Case No. 2:04-cv-340-JES-SPC.) District Judge John E. Steele denied the petition in a thorough 43-page order. (Id. at 336–78.) Both this Court and the Eleventh Circuit denied Petitioner a certificate of appealability. (Id. at 384–87.)[1] On March 18, 2019, Petitioner sought leave to file a second or successive federal habeas petition. (Id. at 1058–63.) The Eleventh Circuit denied the application. (Id. at 1140–43.)

On October 10, 2020, Petitioner filed a motion to correct an illegal sentence in state court. (Doc. 16-4 at 1178–1235.) The state stipulated to the entry of an order vacating the original sentence and resentencing Petitioner *de novo*. (Id. at 1237–38.) On June 21, 2021, the state court orally pronounced a sentence of life in prison on Petitioner's murder conviction and a consecutive sentence of 46.75 months in prison on the attempted robbery count. (Id. at 1247–48, 1252–60.)

Petitioner provided his *pro se* amended petition for habeas corpus relief to prison officials on April 24, 2024. (Doc. 2.)[2]

---

[1] In the fifteen years between 2004 and 2019, Petitioner filed numerous postconviction motions in state court, which were either denied or dismissed. (See Doc. 16-4 at 389–405, 416–20, 424–36, 440–41, 476–79, 781–83, 792–831, 861–70, 1009–24.) Except where relevant to the Court's review of this petition, these pleadings will not be further discussed.

[2] Generally, the date of prisoner's filing is the date the *pro se* prisoner delivers his document to the prison official for mailing. Houston v. Lack, 487 U.S. 266, 275 (1988).

## II.    Governing Legal Principles

### A.    The Antiterrorism Effective Death Penalty Act (AEDPA)

Under the AEDPA, federal habeas relief may not be granted with respect to a

claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).    In this context, "clearly established federal law"

consists of the governing legal principles, and not the <u>dicta</u>, set forth in the

decisions of the United States Supreme Court at the time the state court issued its

decision.    White v. Woodall, 572 U.S. 415, 420 (2014); Carey v. Musladin, 549 U.S.

70, 74 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).

A decision is contrary to clearly established federal law if the state court

either: (1) applied a rule that contradicts the governing law set forth by Supreme

Court case law; or (2) reached a different result from the Supreme Court when faced

with materially indistinguishable facts.    Ward v. Hall, 592 F.3d 1144, 1155 (11th

Cir. 2010); Mitchell v. Esparza, 540 U.S. 12, 16 (2003).    A decision involves an

unreasonable application of clearly established law if the state court correctly

identifies the governing legal principle, but applies it to the facts of the petitioner's

case in an objectively unreasonable manner, Brown v. Payton, 544 U.S. 133, 134

(2005), or "if the state court either unreasonably extends a legal principle from

[Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000) (quoting Williams, 529 U.S. at 406).

The section 2254(d) standard is both mandatory and difficult to meet. To demonstrate entitlement to federal habeas relief, the petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." White, 572 U.S. at 420 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). Moreover, when reviewing a claim under section 2254(d), a federal court must presume that any "determination of a factual issue made by a State court" is correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e).

A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits, warranting deference. Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008). Generally, in the case of a silent affirmance, a federal habeas court will "look through" the unreasoned opinion and presume that the affirmance rests upon the specific reasons given by the last court to provide a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991); Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). However, the presumption that the appellate court relied on the same reasoning as the lower court can be rebutted "by evidence of, for instance, an alternative ground that was argued [by the state] or

that is clear in the record" showing an alternative likely basis for the silent affirmance.   Sellers, 138 S. Ct. at 1196.

## B.    Ineffective Assistance of Counsel

In Strickland v. Washington, the Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance.   466 U.S. 668, 687–88 (1984).   A petitioner must establish that counsel's performance was deficient and fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense.   Id.   A showing on only one prong will not support an ineffective assistance claim.   Id. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.").

The focus of inquiry under Strickland's performance prong is "reasonableness under prevailing professional norms."   Id. at 688.   In reviewing counsel's performance, a court must adhere to the presumption that "counsel's conduct falls within the wide range of reasonable professional assistance[.]"   Id. at 689 (citation omitted).   A court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a highly deferential level of judicial scrutiny.   Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).   Proving Strickland prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."   Strickland, 466 U.S. at 687.

### C.    Exhaustion and Procedural Default

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of available relief under state law.    28 U.S.C. § 2254(b)(1).    Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]"    Duncan v. Henry, 513 U.S. 364, 365 (1995).    The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim.    Snowden v. Singletary, 135 F.3d 732, 735–36 (11th Cir. 1998).    Under the similar doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule."    Martinez v. Ryan, 566 U.S. 1, 9 (2012).

A petitioner can avoid the application of the exhaustion or procedural default rules by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation.    Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1179–80 (11th Cir. 2010).    To show cause, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court."    Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999).    To show prejudice, a petitioner must demonstrate a reasonable probability that the outcome of the proceeding would have differed.    Crawford v. Head, 311 F.3d 1288, 1327–28 (11th Cir. 2002).

A second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]"  Murray v. Carrier, 477 U.S. 478, 496 (1986).

### III.    Discussion

On December 11, 1995, two black men—one brandishing a firearm—entered a small convenience store in Nocatee, Florida.   (Doc. 16-2 at 287.)   One of the men demanded money at gunpoint from the store's owners, Ricky and Maria Hernandez. (Id.)   In the process of the robbery, the man with the gun fatally shot Ricky Hernandez, who returned fire at least five times before he collapsed.   (Id. at 287, 290–91.)   The shooter, severely wounded, attempted to crawl from the store.   (Id. at 202–03.)   The other robber fled and was never captured.   (Id. at 291.)   In his order on Petitioner's first section 2254 motion, Judge Steele summarized the evidence adduced at trial as follows:

> The murder victim's wife testified that Tyler, the man found lying near the front door of the store, was the man who came into the store, robbed them and shot her husband to death.   The murder victim's daughter also testified that the person who had crawled to the front of the store, Tyler, was the man who came into the store, robbed them and shot her father to death.    The victim's cousin, Jorge Esparza, testified that he was allowed by the gunmen to leave the store, unharmed, before the victim was shot.   He further testified that Tyler, whom he identified in court, was the man lying on the floor when he returned to the store.   Another customer at the store, Elodio Mejia, testified that the shirt that was worn by Tyler at the time of the murder, was "just like" the one he saw the gunman wearing when he entered the store to rob it.   He described the gunman as wearing dark clothing and wearing something red tied around his face, covering the front of his face from his nose down.   He further testified that one of the robbers entered the kitchen with

8

him and two other people, Janet Hernandez and Jorge Esparza,
while the other robber remained in the main part of the store.
When Mr. Mejia exited the kitchen, he then exited the store
through the front door; when he returned shortly after the
shooting because he heard Mrs. Hernandez' screams for help, he
saw "[a] man laying on the floor in front of the door."   At the
physical location of the shooting, directly in front of the counter
where the shots were fired, a trail of blood [led] away from the
counter toward the door where Tyler was found resting.
Petitioner was bleeding and the trail of blood directed to him.

During a search of the store, a mask and a red bandana was
found under an ice machine a few feet from the location where
Tyler was found bleeding from gunshot wounds.   Lieutenant
Sam Williamson of the DeSoto County Sheriff's Office discovered
the bandana while investigating the crime scene.   He was
advised that the gunman had been wearing "something red"
covering his face and searched the area where Tyler had been
lying.   There were bloody red drag marks on the floor leading to
the area near the ice machine.   A photograph of the bandana
under the ice machine was admitted into evidence and published
to the jury.   The evidence adduced at trial showed that there
was a bloody trail starting near the store counter where the
robber had engaged in a shootout with the murder victim.
Where the blood trail began was near where the murder weapon
was found.   The trail then led to the area near the ice machine
where the bandana was found, and then toward the front door
where Tyler was laying when police arrived.   Elodio Mejia, who
had been eating in the supermarket/restaurant, observed the
two black men when they entered the supermarket.   He
testified at trial the man carrying the gun was wearing the
dark-colored shirt and "had something tied around the bottom of
his nose down on his face."   He said the object covering the
robber's face was the color red.   Mr. Mejia testified that the red
color of the object on the man's face was "just like" the red in the
photograph of the bandana recovered from the scene.

James Osterhout, who worked as a paramedic/firefighter for
DeSoto County Fire and Rescue Department, was a first
responder at the scene of the supermarket.   Osterhout started
patient care on Tyler, who was located inside the doorway.
Osterhout recalled immediately placing Tyler on a back board,
placing him inside the ambulance to render care, and asking
him a series of questions.   He asked Petitioner if he had been
robbing the store.   Osterhout testified that Petitioner nodded

his head affirmatively, looking Osterhout in the eye.  Osterhout noted that he assessed Petitioner's level of alertness as orientated as to person, place and time, and this was reflected on the standard state E.M.T. form.  Osterhout, as the lead paramedic, testified that he completed the report on a standard state form indicating that the "patient with multiple gunshot wounds was complaining of pain to his abdomen, states he was robbing the store."  A videotaped deposition of James Osterhout was played to the jury.

The murder weapon was also recovered from the scene of the crime.  The murder victim, Enrique Hernandez, used a 9 millimeter pistol in his defense during the robbery. The perpetrator was carrying a .357 revolver.  The revolver was found on the floor under a shelf near the counter where the robber and victim exchanged gunfire.  A photograph of the revolver was admitted as evidence at trial and published to the jury.

(Doc. 16-4 at 338–41 (citations to the record omitted).)

In his current habeas petition, Petitioner raises thirteen claims of ineffective assistance of trial counsel Jon Weiffenbach (Counsel) and one claim alleging cumulative error.  (Doc. 2.)   As noted, this case is almost thirty years old, and Petitioner admits that most of the ineffective assistance of counsel (IAC) claims now raised were neither developed nor exhausted in state court.  (Doc. 25 at 1–3.) However, he argues that his failure to exhaust his IAC claims should be excused under the Supreme Court's holding in Martinez v. Ryan, 566 U.S. 1 (2012).  (Id.) In Martinez, the Supreme Court held that:

> [A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

Id. at 17.   "[T]o show that an underlying ineffective-assistance-of-counsel claim is 'substantial,' a petitioner must establish that 'jurists of reason would find it debatable.' " McKiver v. Sec'y, Fla. Dep't of Corr., 991 F.3d 1357, 1368 (11th Cir. 2021) (quoting Hittson v. GDCP Warden, 759 F.3d 1210, 1269–70 (11th Cir. 2014)). When first decided, Martinez appeared to open a wide gateway for the development of defaulted IAC claims in federal court.   However, the Supreme Court has since substantially narrowed the case's scope for habeas petitioners.   In Shinn v. Ramirez, 142 S. Ct. 1718 (2022), the Court expressly rejected a petitioner's request to interpret Martinez as allowing petitioners to expand the state court record to develop defaulted IAC claims in federal habeas court.   Id. at 1737–38.   The Court determined that "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."   Id. at 1734.[3] Therefore, unless the newly raised IAC claims are based on a new rule of constitutional law (not applicable here) or based on a factual predicate that could not have been previously discovered with diligence (also not applicable here), Petitioner may not bring in new evidence to support his unexhausted IAC claims and must rely solely on the state court record.   Likewise, Petitioner may not bring

---

[3] Section 2254(e)(2) provides that if the petitioner did not develop the factual basis of the claim in state court, this Court may not hold an evidentiary hearing on the claim unless the claim relies on "new rule of constitutional law, made retroactive to cases on collateral review" or "a factual predicate that could not have been previously discovered through the exercise of due diligence[.]"   28 U.S.C. § 2254(e)(2).

in new evidence to support any claims that were exhausted in state court.    See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (holding that "review [under § 2254(d)(1)] is limited to the record that was before the state court that adjudicated the claim on the merits").

Respondent filed a response to the petition.    (Doc. 16.)    Before addressing Petitioner's individual claims on the merits, Respondent argues that this petition should be dismissed because Petitioner filed a 28 U.S.C. § 2254 federal habeas petition in 2003, which was considered and denied on the merits by this Court. Respondent notes that all the claims raised in the current petition could have (and should have) been raised in his 2003 petition and argues:

> Therefore, under principles of res judicata and/or abuse of the writ, [Petitioner] should not be permitted to raise them now. Res judicata precludes a party from raising claims that were or could have been raised in a prior proceeding.    See Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc., 140 S. Ct. 1589, 1594–95 (2020).    Abuse of the writ occurs when a petitioner raises a claim in a later petition that he failed to raise in a prior petition "through inexcusable neglect."    McCleskey v. Zant, 499 U.S. 467, 489 (1991).

(Id. at 9.)    Respondent acknowledges two points that do not support this argument. First, Respondent notes that the United States Supreme Court has found that " 'res judicata is inapplicable in habeas proceedings.' "    (Id. at 10 (quoting Sanders v. United States, 373 U.S. 1, 8 (1963) and Fay v. Noia, 372 U.S. 391, 423 (1963)).) But, Respondent explains, subsequent to Sanders and Fay, "[C]ongress evinced an intent to respect the finality of state court convictions and apply res judicata principles to federal habeas proceedings."    (Doc. 16 at 10 (citing Jones v. Hendrix, 599 U.S. 465, 491 (2023) ("AEDPA's second-or-successive restrictions . . . 'constitute

12

a modified res judicata rule[.]' "(quoting Felker v. Turpin, 518 U.S. 651, 664 (1996)))).)   Next, Respondent acknowledges that language in Magwood v. Patterson, 561 U.S. 320 (2010) suggests that "post-AEDPA, traditional abuse of the writ principles no longer apply to federal habeas petitions."   (Doc. 16 at 10.) However, Respondent argues that the relevant language in Magwood is mere *dicta* because it was not necessary to the outcome in that case.   While both arguments are reasonable, they do not carry the day.

Generally, a prisoner may not file a second or successive section 2254 petition in the district court without first obtaining authorization from a federal court of appeals.   See 28 U.S.C. § 2244(b)(3)(A).   District courts lack jurisdiction to consider the merits of second or successive section 2254 petitions filed without such authorization.   Lambrix v. Sec'y, Dep't of Corr., 872 F.3d 1170, 1180 (11th Cir. 2017).   However, in Insignares v. Sec'y, Fla. Dep't of Corr., 755 F.3d 1273, 1280–81 (11th Cir. 2014), the Eleventh Circuit held that a petitioner may challenge his undisturbed conviction in a successive section 2254 petition without running afoul of section 2244(b)(3)(A) when a state imposed a new sentence that resulted in a new judgment.   In short, the Eleventh Circuit did not find a successive petition to be an abuse of the writ or barred by res judicata when a new sentence resulted in a new judgment—even when the successive petition attacked only the conviction itself. And here, it appears that when the state court resentenced Petitioner, it vacated the original sentence and created a new judgment.   (See Doc. 16-4 at 1237, 1240–42, 1252.)   And while circuit courts are split on the issue of whether a resentencing

that results in an intervening new judgment obviates the requirement under section 2244(b)(3)(A) for a petitioner to obtain prior authorization from the circuit court before filing a successive section 2254 petition,[4] this Court may not ignore or overrule the precedent from the Eleventh Circuit, which clearly states that such authorization is <u>not</u> required.   In short, even if this Court agreed with the Third, Seventh and Tenth Circuits on this issue,[5] the structure of the federal judicial system requires lower courts to faithfully apply legal precedent established by supervisory appellate courts, which, for this district court, is the rule set forth by the Eleventh Circuit in <u>Insignares</u>.   <u>See</u> <u>e.g.</u>, <u>Rodriguez de Quijas v. Shearson/American Express, Inc.</u>, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").   Likewise, even if the language in <u>Magwood</u> regarding abuse of the writ principles is not binding on this Court (as Respondent argues), the <u>Magwood</u> *dicta*

---

[4] Circuit courts are split on whether a mere resentencing constitutes an intervening new judgment when the petitioner collaterally attacks his underlying conviction.   The Second, Fourth, Six, Ninth, and Eleventh Circuits all conclude that a petition that results in a new judgment after resentencing and challenges an undisturbed conviction is not second or successive.   <u>See</u> <u>Johnson v. United States</u>, 623 F.3d 41, 46 (2d Cir. 2010); <u>In re Gray</u>, 850 F.3d 139, 141–42 (4th Cir. 2017); <u>King v. Morgan</u>, 807 F.3d 154, 158 (6th Cir. 2015); <u>Wentzell v. Neven</u>, 674 F.3d 1124, 1127–28 (9th Cir. 2012); <u>Insignares</u>, 755 F.3d at 1281.   The Third, Seventh and Tenth Circuits have held otherwise.   <u>See</u> <u>Romansky v. Superintendent Greene SCI</u>, 933 F.3d 293, 300 (3d Cir. 2019), <u>Suggs v. United States</u>, 705 F.3d 279, 282–83 (7th Cir. 2013); <u>Pendergast v. Clements</u>, 699 F.3d 1182, 1186–88 (10th Cir. 2012).

[5] The undersigned expresses no opinion on the matter.

still provides guidance on whether abuse of the writ principles apply here.   See

Peterson v. BMI Refractories, 124 F.3d 1386, 1392 (11th Cir. 1997) ("[D]icta from

the Supreme Court is not something to be lightly cast aside.").   Thus, the Court will

review Petitioner's second 28 U.S.C. § 2254 petition to determine whether he is

entitled to federal habeas corpus relief without first requiring him to obtain

permission from the Eleventh Circuit.

 With these considerations in mind, the Court reviews each of Petitioner's

claims.[6]

## A. Claim One (A)

 Petitioner asserts that "Counsel was ineffective for not moving the court to

place limits on the aggressive, constant, and intrusive presence of the news media

in the courtroom during [his] trial."   (Doc. 2 at 8.)   Petitioner asserts that his trial

was "held in an uneventful small rural town" and "attracted a large number of

spectators and news-people."   (Id.)   He asserts that Fox News had cameras in the

courtroom, one of which was aimed at the jury.   (Id.)   Petitioner alleges that the

"jurors were frequently distracted by seeing their faces televised."   (Id.)   After two

days, the prosecution objected to the news crew taking pictures of the jury and the

evidence.   (Id. at 9.)   Petitioner asserts that "Fox News still continued televising

the jury and trial proceedings, but with less frequency."   (Id.)   Petitioner contends

---

[6] Petitioner raises three grounds for relief, with Grounds One and Two
containing multiple sub-grounds alleging ineffective assistance of counsel.   To
avoid confusion, the Court will mimic Petitioner's numbering system.

that, since the jury was not sequestered, they saw themselves on television when

they returned home each evening and felt pressured to find him guilty.    (Id.)

The only record evidence of media presence surrounding Petitioner's trial is

the following brief discussion between the prosecutor and the trial court regarding

the media:

> Q.    Your Honor, we have a television crew and reporters in here
> taking pictures of the jury and evidence of the decedent, and
> I don't think it is a good idea.    And I object to their taking
> pictures of the jurors, and object to their taking pictures of
> evidence as it's been met.
>
> A.    They've been doing it all afternoon.
>
> Q.    I never noticed.    The State would move for a quick recess
> and ask the bailiff to ask them to come to chambers and ask
> them not to take pictures of the evidence or the jury.

(Doc. 16-2 at 481–82.)    The trial court then called Fox News to the stand and had a

brief discussion off the record.    (Id. at 482.)    Petitioner asserts that Fox News

continued to record the trial (albeit less frequently) and that Counsel should have

objected and "moved for a mistrial on the ground that the jury had been irreparably

damaged by being constantly televised."    (Doc. 2 at 9.)

The Court need not consider the performance prong of Strickland because

Petitioner has not demonstrated prejudice from the media presence in the

courtroom.    Although he speculates that the jurors went home every night,

watched themselves on television, and felt pressured by "family, friends, and

neighbors" to find him guilty, Petitioner does not direct the Court to any record

evidence to support these assertions.    In short, he does not present evidence that a

single juror was inclined to find him guilty as a result of the media presence.    See

Chandler v. Florida, 449 U.S. 560, 581 (1981) ("To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters").   "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different" had Counsel performed as Petitioner now argues he should have.   Wong v. Belmontes, 558 U.S. 15, 27 (2009) (quoting Strickland, 466 U.S. at 694).   Petitioner cannot meet this burden with mere speculation.   See Hill v. Lockhart, 474 U.S. 52, 60 (1985) (explaining that conclusory allegations of ineffective assistance of counsel are insufficient to prove Strickland prejudice); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (same).

Because Petitioner cannot demonstrate Strickland prejudice, Ground One (A) is not substantial, and Petitioner's default of this claim is not excused under Martinez.   Thus, Ground One (A) is dismissed as unexhausted and procedurally barred from consideration.   Alternatively, the claim is denied on the merits.   See 28 U.S.C. § 2254(b)(2)(" An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

### B.    Ground One (B) and Ground One (C)

Petitioner frames Ground One (B) and Ground One (C) as follows:   At the beginning of jury selection, Counsel advised the judge that there had been a news article about the case in that day's newspaper.   (Doc. 2 at 9.)   The judge asked the prospective jurors if they had read the story.   (Id.)   Four jurors answered affirmatively.   (Id.)   The judge called these four prospective jurors into chambers

at the same time and questioned them about the article.    (Id.)    Two of the jurors,
Ruth Blanton and Rebecca Mattson, were ultimately selected to serve.    (Id. at 10.)
Petitioner asserts that Juror Mattson admitted to reading the entire article.    (Doc.
2 at 11.)    Due to the Juror reading the article, Petitioner claims that Juror Mattson
"was too familiar with the specifics of the case to be a fair and impartial juror."
(Id.)    He asserts that Juror Blanton was tainted from hearing the details of the
case from the other prospective jurors.    (Id.)    He notes that "[a]lthough Blanton
and Mattson said they could put aside the opinion of the article that Tyler was
unquestionably guilty, it is unrealistic to assume these jurors could erase the
prejudicial impact of the article from their minds.[7]    Counsel's deficient performance
in not moving to strike jurors Blanton and Mattson [Ground One (B)] and in not
moving for individual sequestered *voir dire* [ Ground One (C)] deprived Tyler of his
right to a fair and impartial jury."    (Doc. 2 at 11.)

A criminal defendant has a right to an impartial jury, and a prospective juror
who lacks impartiality must be excused for cause.    See Ross v. Oklahoma, 487 U.S.
81, 85–86 (1988).    To exclude a prospective juror for cause, a party "must
demonstrate that the juror in question exhibited actual bias by showing either an
express admission of bias or facts demonstrating such a close connection to the

---

[7] Notably, although Petitioner asserts that "[t]he article portrayed [him] as a
dangerous career criminal and highlighted in a detailed table that [he] had been
arrested 20 times and convicted of crimes 5 times" (Doc. 2 at 11), the record does not
contain a copy of the article at issue here.    The only description of the article is the
one from Counsel when he informed the court that there was an article in the
newspaper that "wasn't so bad, except towards the end, started talking about his
priors."    (Doc. 16-2 at 106.)

present case that bias must be presumed." United States v. Chandler, 996 F.2d 1073, 1102 (11th Cir. 1993) (emphasis added); see also Smith v. Phillips, 455 U.S. 209, 215 (1982). The burden is on the challenger to show the prospective juror has sufficient actual bias to raise the presumption of partiality. Irvin v. Dowd, 366 U.S. 717, 723 (1961).

Under Florida law, the test for determining juror competency is "whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." Lusk v. State, 446 So. 2d 1038, 1041 (Fla. 1984). In an unpublished opinion, the Eleventh Circuit has clarified what a petitioner must show to prove Strickland prejudice resulting from juror bias on postconviction review:

> In the post-conviction context . . . Florida has an actual bias requirement. See Carratelli v. State, 961 So. 2d 312, 323 (Fla. 2007). "[W]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was *actually biased*." Id. at 324 (emphasis added). To meet the actual bias standard, "the defendant must demonstrate that the juror in question was not impartial—i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record. " Id.

Fennell v. Sec'y, Fla. Dep't of Corr., 582 F. App'x 828, 832 (11th Cir. 2014). While Petitioner argues that the jurors' exposure to the news article automatically disqualified them, he presents no evidence that an "actually biased" juror served on his jury. When questioned by the court, Jurors Blanton and Mattson said that they did not remember details from the article and said that they could be open-minded and fair. (Doc. 16-2 at 129–30, 131–33.) Moreover, all the jurors took an

oath to be fair and impartial.   (Id. at 267.)   "Jurors are presumed to follow the law as instructed by the trial court and to comply with their oaths." Fennel, 582 F. App'x at 834.   Even if Jurors Blanton and Mattson learned some details about the case or Petitioner's criminal history from the articles or from the court's questions to other jurors, the Supreme Court has explained that "juror *impartiality* . . . does not require [juror] *ignorance*." Skilling v. United States, 561 U.S. 358, 381 (2010) (emphases in original) (citing Irvin v. Dowd, 366 U.S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.")); Reynolds v. United States, 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.").   With no evidence that Jurors Blanton or Mattson were actually biased by their exposure to a news article, we must presume that they followed the trial judge's instructions and were fair and impartial during deliberations.

Because Petitioner cannot demonstrate Strickland prejudice, Grounds One (B) and One (C) are not substantial, and Petitioner's default of these claims is not excused under Martinez.   Thus, Grounds One (B) and One (C) are dismissed as unexhausted and procedurally barred from consideration.   Alternatively, the claims are denied on the merits.   28 U.S.C. § 2254(b)(2).

### C.    Ground One (D) and Ground One (E)

In Ground One (D), Petitioner asserts that Counsel was ineffective for "not objecting to the prosecutor's peremptory strike of Sandra Lewis, a black juror, on the ground the prosecutor's race neutral reason for striking her was a pretext." (Doc. 2 at 11.)    In Ground One (E), he asserts that Counsel "was ineffective for not investigating the prosecutor's race neutral reason for striking Sandra Lewis, a black juror, where the investigation would have revealed the reason was false."    (Id.)

During voir dire, the state questioned potential juror Sandra Lewis.    Ms. Lewis said that her son had been both a suspect and a victim in state cases.    (Doc. 16-2 at 163.)    When asked, Ms. Lewis affirmed that she could be a fair juror for both the state and the defense despite her son's involvement in the criminal justice system.    (Id. at 163–64.)    Ms. Lewis also affirmed that law enforcement treated her son well when he violated his probation by being out past curfew.    (Id. at 174.) The state later used a peremptory challenge to strike Ms. Lewis.    (Doc. 16-2 at 228.)    Counsel objected and asked for the basis for striking her.    (Id.)    The prosecutor explained:

> Judge, Ms. Lewis was, in fact, in my office with her son.    He was charged with a felony and a misdemeanor.    He was also the victim on an alleged lewd and assault on an adult, wherein he was – he was supposedly having sex with an adult female.
>
> Contrary to what she has said, I am very uncomfortable with Ms. Lewis serving on a jury, because I know that she was displeased with the disposition of that case.    And I feel, basically that I would prefer to have her not serve as a juror in this case.

(Id. at 228–29.)   The trial court accepted the state's explanation as race-neutral.

(Id. at 229.)   Petitioner complains that, had the prosecutor truly believed that Ms.

Lewis was unhappy with the outcome of her son's case, he would have asked her

different questions during voir dire.   (Doc. 2 at 12.)   Petitioner argues (without

directing the Court to any record evidence that supports his argument) that a

different assistant state attorney had handled Ms. Lewis's son's case and that her

son had gotten "a great plea deal that involved no incarceration."   (Id.)   He asserts

that, had Counsel investigated the matter, he "would have been able to file a motion

for a new trial on the ground the prosecutor falsely told the court that Mr. Lewis

'was displeased with the disposition' of her son's case."   (Id. at 13.)

In Batson v. Kentucky, 476 U.S. 79, 96–97 (1986), the Supreme Court held

that peremptory challenges cannot be used to exclude members of racial minorities

from a jury.   In considering a claim of ineffective assistance of counsel for failing to

raise a Batson objection, the Eleventh Circuit has recognized that state courts must

consider all relevant circumstances to determine whether the State had a valid,

race-neutral reason for its challenge to a black juror.   See Lee v. Commissioner,

Ala. Dep't of Corr., 726 F.3d 1172, 1224–25 (11th Cir. 2013) (recognizing that a

court should consider "the totality of all other relevant circumstances" when

reviewing a Batson claim).   If the record shows that the state had a race-neutral

reason for its challenge, defense counsel will not be deemed deficient for failing to

raise a Batson objection, nor can the petitioner demonstrate prejudice.   See West v.

Secretary for Dept. of Corrections, 151 F. App'x 820, 824 (11th Cir. 2005).   And

entanglement with the justice system by a prospective juror or her relatives has been found to withstand <u>Batson</u> scrutiny.   See <u>West,</u> 151 F. App'x at 824 (prospective juror's prior arrest was a race-neutral reason for challenge); <u>Miller–El v. Cockrell,</u> 537 U.S. 322, 351 (2003) (prospective juror's brother's convictions for drug offenses was a race-neutral reason for striking the juror); <u>United States v. Alston,</u> 895 F.2d 1362, 1367 (11th Cir. 1990) (prior involvement with drug offenses was race-neutral reason for challenge); <u>Lee</u> 726 F.3d at 1227 (that prospective juror's family member had been arrested and charged with a property crime was a race-neutral reason for challenge).

Petitioner offers nothing to suggest that <u>no</u> competent defense attorney would have believed the state's explanation for using a peremptory strike on Ms. Lewis and decided against further investigation.   See <u>Payne v. Allen,</u> 539 F.3d 1297, 1317 (11th Cir. 2008) (explaining that the "test for reasonableness" is whether counsel's performance fell within the "wide range" of professionally competent assistance). As explained above, a family member's entanglement with the justice system is routinely deemed a race-neutral reason for exercising a peremptory strike.   The argument offered by Petitioner does not satisfy <u>Strickland</u>'s performance prong.

Next, even if Petitioner could establish that Counsel's performance was deficient, a successful <u>Batson</u> claim does not require automatic reversal on collateral review.   <u>Price v. Sec'y, Fla. Dep't of Corr.,</u> 548 F, App'x 573, 576 (11th Cir. 2013).   To the contrary, "the law of this circuit [is] that an ineffective assistance of counsel claim based on the failure to object to a structural error at

trial requires proof of prejudice." Purvis v. Crosby, 451 F.3d 734, 742 (11th Cir. 2006). And to establish prejudice from Counsel's failure to challenge the prosecutor's strike of Ms. Lewis, Petitioner must show that a biased juror served on his jury or that the outcome of his trial would have been different with a different juror sitting on his jury. See Purvis, 451 F.3d at 739; Sneed v. Fla. Dep't of Corr., 496 F. App'x. 20, 27 (11th Cir. 2012) ("Sneed has not shown that, had counsel objected, his challenge would have been successful, nor is it clear that the second prospective black juror being on the jury would have carried a reasonable probability of changing the outcome of the trial.") (citation omitted); Mobley v. Sec'y, Fla. Dep't of Corr., 825 F. App'x 651, 655 (11th Cir. 2020) (finding that the petitioner could not demonstrate Strickland prejudice because "Mobley did not attempt to establish that a juror placed on the jury despite his Batson challenge was actually biased against him").

Here, having conducted a thorough review of the record, there is no evidence that a black juror would have seen the overwhelming evidence against Petitioner any differently than the white jurors.[8] While the victim in this case was Hispanic

---

[8] The evidence against Petitioner was significant. In an order denying one of Petitioner's numerous postconviction motions, the postconviction court listed eight pieces of "significant testimony and evidence admitted during the trial indicating that [Petitioner] was the perpetrator" of the crime:

    1.      He was shot eight times;

    2.      He was found at the end of a trail of blood in front of the counter;

and Petitioner is black, race did not play a significant role at trial.    Significantly,
Petitioner does not attempt to show otherwise, focusing instead on <u>Strickland</u>'s
performance prong and arguing that a thorough investigation would have led to a
reversal and a new trial.    (Doc. 2 at 13.)

In sum, Petitioner offers no evidence showing deficient performance or
suggesting that a biased juror sat on his jury.    Thus, Grounds One (D) and One (E)
are not substantial, and Petitioner's default of these claims is not excused under
<u>Martinez</u>.    Thus, these grounds are dismissed as unexhausted and procedurally
barred.    Alternatively, the claims are denied on the merits.    28 U.S.C. § 2254(b)(2).

---

3.    He admitted to the treating paramedic that he "was
robbing the store";

4.    All of the eyewitnesses described the person shot by
the store owner (who was the murder victim) as a
person wearing a purple shirt;

5.    The Defendant was wearing a purple shirt, and
that shirt was removed by paramedics;

6.    The victim's daughter stated that the person who
shot the victim fell down in the store after he
himself had been shot, and then dragged himself to
the door; the Defendant was found at the door of
the store;

7.    After he heard gunfire in the store, another witness
came out and saw the person who had entered the
store with a gun lying on the floor near the front
door;

8.    Another witness saw "the man in the purple shirt"
exchange gunfire with the victim.

(Doc. 16-4 at 483 (citations to the record omitted).)

### D.     Ground One (F)

Petitioner asserts that Counsel was ineffective for failing to move for a mistrial "when the prosecutor delayed until the day after jury selection was over" to strike the only remaining black juror on his jury.   (Doc. 2 at 13.)   While recognizing that Juror Morris Johnwell had not disclosed his prior arrests during voir dire, Petitioner argues that the prosecution unfairly delayed removing him from the jury.   (Id. at 13–14.)   Petitioner asserts that he wanted "to have at least one black person on the jury" and that he "could have used [his remaining peremptory challenges] to reach additional blacks in the jury venire who were in line to be seated."   (Id. at 14.)

Petitioner notes that, on the morning of trial (and after the jury had been chosen), the state moved to strike juror Morris Johnwell.   (Doc. 16-2 at 275.)   The prosecutor explained that Mr. Johnwell had not raised his hand when the panel was asked whether anyone had been arrested on either a misdemeanor or a felony. (Id.)   After Mr. Johnwell was selected for the jury, the State Attorney's Office discovered that he had been arrested (but not convicted) on five drug-related charges.   (Id. at 276.)   Counsel argued that there was no evidence that Mr. Johnwell deliberately tried to mislead the court.   (Id.)   Counsel further argued that the defense had "elected not to exercise additional peremptory challenges [it] had available . . . based solely, strictly on the fact that [it was] concerned about Mr. Johnwell no longer being part of the jury panel."   (Id. at 280.)   The prosecutor countered that "Mr. Johnwell was less than candid with this Court and whether it was deliberate or whether he misunderstood it, we feel that his lack of response to

26

the question is prejudicial to the State's case."    (Id. at 278.)    The prosecution

pointed out that even if Mr. Johnwell had been confused about the question, "he

wasn't paying attention and if you're not paying attention, that certainly is reason

that this Court could find at the recommendation of the State to strike him for race

neutral reasons."    (Id. at 280.)    The prosecutor also pointed out that, like the

defense, the State had not used all its peremptory challenges.    (Id.)    The trial court

granted the State's motion and replaced Mr. Johnwell with an alternate juror.    (Id.

at 285.)

Counsel objected to Mr. Johnwell's replacement with an alternate juror, so he

cannot be deemed ineffective in that regard.    (Id. at 277, 279.)    But Petitioner

argues that Counsel should have moved for a mistrial when Mr. Johnwell was

replaced because he (Petitioner) wanted him on his panel and had not used all his

peremptory challenges.    (See id. at 280.)    Petitioner cannot demonstrate that he

suffered prejudice from Mr. Johnwell's removal because a motion for mistrial would

not have been granted.

As a general rule, "[t]he conduct of jurors is the responsibility of the court and

the court is allowed discretion in dealing with any problems that arise."    Orosz v.

State, 389 S.2d 1199, 1200 (Fla. 1st DCA 1980); see also Jennings v. State, 512 So.

2d 169, 173 (Fla. 1987) ("The trial judge has broad discretion in deciding whether a

juror may sit.").    Mr. Johnwell lied (even if inadvertently) about his criminal

history during the jury selection process, and the state court properly removed him

from the panel.    " 'A juror who falsely misrepresents his interest or situation, or

conceals a material fact relevant to the controversy, is guilty of misconduct[.]' " De La Rosa v. Zequeira, 659 So. 2d 239, 241 (Fla.1995) (quoting Loftin v. Wilson, 67 So.2d 185 (Fla.1953)); see also Minnis v. Jackson, 330 So. 2d 847, 848 (Fla. 3d DCA 1976) ("The well established rule is that the failure of a juror to honestly answer material questions propounded to him on voir dire examination constitutes bad faith requiring his disqualification from serving on the jury in the case."). Thus, "a juror's concealment of material information during voir dire provides good cause for removal of that juror mid-trial and substitution with an alternate juror." Nicholas v. State, 47 So. 3d 297, 303 (Fla. 2d DCA 2010).

Because Mr. Johnwell's dishonest answers disqualified him from serving on the jury in this case, Counsel was not ineffective for failing to move for a mistrial after he was removed from the panel because a mistrial would not have been granted. See Brownlee v. Haley, 306 F.3d 1043, 1066 (11th Cir. 2002) (defense counsel is not ineffective for failing to raise issues that "clearly lack merit").

Ground One (F) satisfies neither Strickland prong, and the claim is not substantial. Thus, Petitioner's failure to exhaust this claim is not excused under Martinez. Ground One (F) is dismissed as unexhausted and procedurally barred. Alternatively, the claim is denied on the merits. 28 U.S.C. § 2254(b)(2).

### E.    Ground One (G)

Petitioner asserts that Counsel was ineffective for not explaining what is necessary to impose the death penalty when advising him of the State's offer not to seek the death penalty in exchange for waiving a 12-person jury. (Doc. 2 at 14.) He admits that he waived a 12-person jury (both in open court and by writing) but

argues that the waiver wasn't knowing and voluntary because "counsel did not advise [him] of all that's required to actually impose the death penalty." (Id.) Specifically, Petitioner claims that he believed that the death penalty would be automatic if convicted. (Id. at 15.)

Counsel's advice to waive a 12-person jury in exchange for the state not to seek the death penalty was clearly a strategic decision. The Eleventh Circuit has addressed this issue in the context of a habeas IAC claim and determined that this exchange is a reasonable trial strategy. Cabberiza v. Moore, 217 F.3d 1329, 1334 n.10 (11th Cir. 2000) ("Because Florida provides six additional jurors by right to a defendant charged in a capital case, it is a common practice of defense attorneys to trade a waiver of twelve jurors for an agreement by the State not to seek the death penalty. We have previously held that such a strategic decision by defense counsel does not constitute ineffective assistance of counsel." (citing Chateloin v. Singletary, 89 F.3d 749, 752–53 (11th Cir. 1996))). Moreover, to demonstrate prejudice from a six-person jury, Petitioner must show "a reasonable probability that an acquittal or hung jury would have resulted had [his] counsel insisted on twelve jurors." Cabberiza, 217 F.3d at 1334. Petitioner has not made the required showing. Indeed, "[t]he Supreme Court itself has said that 'neither currently available evidence nor theory suggests that the 12-man jury is necessarily more advantageous to the defendant than a jury composed of fewer members.'" Id. at 1335 (quoting Williams v. Florida, 399 U.S. 78, 101-02 (1970)). Accordingly, any "claim of prejudice is entirely speculative because [Petitioner] relies entirely on the

mere possibility at least one of the six additional jurors would have voted to acquit him." Joseph v. Sec'y, Fla. Dep't of Corr., No. 3:15-cv-1363-MMH-JRK, 2018 WL 5024180, at *14 (M.D. Fla. Oct. 17, 2018).

Petitioner has shown neither deficient performance nor Strickland prejudice from Counsel's recommendation that Petitioner waive a 12-person jury.    Thus, Ground One (G) is not substantial, and Petitioner's default of this claim is not excused under Martinez.    Ground One (G) is dismissed as unexhausted and procedurally barred from consideration.    Alternatively, the claim is denied on the merits.    28 U.S.C. § 2254(b)(2).

### F.    Ground Two (A)

Petitioner asserts that Counsel was ineffective for failing to file a motion asserting that Petitioner's grave medical condition rendered his confession to the treating Emergency Medical Technician (EMT) involuntary and unreliable.    (Doc. 2 at 18.)    He concedes that Counsel sought to suppress his confession on the grounds that it was not admissible under the physician-patient privilege, but argues that "Counsel did not seek to suppress [his] confession on the due process ground [that] it was involuntary because of [Petitioner's] medical condition.    Had counsel done so, the trial court would have suppressed [his] confession." (Id. at 19.)

The record clearly refutes Petitioner's factual allegations.    A review of Counsel's motion to suppress shows that, while Counsel did indeed argue that "the doctor/patient privilege" should extend to cases "where the Defendant is gravely ill and has a high likelihood of dying," he also moved to suppress Petitioner's confession on the ground that Petitioner could not make rational decisions

30

immediately after the shooting due to his grave medical condition.   (Doc. 16-2 at 84–86.)   Specifically, in the written motion, Counsel argued *inter alia* that:

> [Petitioner] was discovered on the floor of a convenience store … with approximately 11 bullet holes in him;
>
> When the EMTs reached Petitioner, he "was in grave condition" and needed immediate emergency care to prevent him from "dying at the scene."
>
> He was placed in the back of an emergency vehicle where an oxygen mask was placed over his face.
>
> While providing treatment, emergency personnel inquired about Petitioner's reasons for being at the convenience store and his possible involvement in the robbery.
>
> While being questioned, as a result of Petitioner's "grave physical condition," Petitioner "was not able to make rational decisions and believed it was necessary to fully cooperate with the questioning" to ensure he did not die on the way to the hospital.
>
> Petitioner was not aware that his statements could be used against him because he thought the questions were for ensuring proper treatment.
>
> Petitioner's "condition was such that [he] could not fully appreciate the nature of the inquiries nor provide necessary rational responses."
>
> Petitioner's "condition was such that [he] cannot defend against the alleged statement as he does not recall a great deal of what transpired during the initial treatment by EMS."

(Doc. 16-2 at 84–85.)   Counsel argued the motion in court prior to trial, providing three reasons for Petitioner's confession to be suppressed:

> We are asking that statement by Earon be suppressed for a number of reasons.   Number one, we believe there should be a privilege provided to an individual being treated, especially somebody in grave condition, because obviously, there is some significant importance allowing a person to be treated freely of communication between themselves, and the patient be able to

provide honest answers and not be concerned about whether or not to respond a certain way, and having to be concerned that this information may potentially be used against them later on for incriminating purposes in the trial.

Secondly, we think it should be suppressed as a result of the fact, obviously, it's because of his condition.   He was not in any kind of a position to make a legal decision, what answer he should provide, what answer he should not provide.   Although [he was not] dealing with a law enforcement officer, he's dealing with someone familiar with crime scenes, somebody familiar with how the process works.   It should not [have] been viewed by the fact an individual may potentially be going -- answering questions he believes he has to answer in order to secure the necessary treatment to preclude him from dying and then later on find out that these statements are going to be used against him.

The last reason we have is that because, again, of the grave condition of Earon at the time this inquiry was made, not only was it not necessarily a rational response that can be relied upon as being necessarily truthful or accurate, but also he remembers very little about what occurred from the time they were transporting him from the convenience store to the hospital for treatment.   And as a result, he was not able to a give us a great deal in attempting to cross-examine his witnesses in attempts to impeach the witnesses as to reliability, credibility, and/or the accuracy of the statements that was supposed to have been made by them.

(Doc. 16-2 at 96–97.)   In short, Counsel made the very arguments regarding

Petitioner's grave medical condition that Petitioner now asserts he should have

made.   That the trial court denied the motion to suppress on the ground that there

was no privilege (Doc. 16-2 at 99) does not change the fact that Counsel made the

argument in the first place.

Ground Two (A) fails to satisfy Strickland's performance prong.   Thus, the

claim is not substantial, and Petitioner's default is not excused under Martinez.

Ground Two (A) is dismissed as unexhausted and procedurally barred from

consideration.    Alternatively, the claim is denied on the merits. 28 U.S.C. § 2254(b)(2).

### G.    Ground Two (B) and Ground Two (C)

In Ground Two (B), Petitioner asserts that Counsel was ineffective for failing to request "an on-the-record waiver showing whether [he] made a knowing, voluntary, and intelligent decision to relinquish his right to be present at the deposition to perpetuate [EMT] Osterhout's video testimony."    (Doc. 2 at 19.)    In Ground Two (C), Petitioner asserts that Counsel was ineffective for failing to move to exclude EMT Osterhout's testimony on the ground that there was no on-the-record waiver of Petitioner's right to be present at his deposition.    (Id. at 20.)

Petitioner argues that "[a]t no time before Osterhout's video deposition did counsel visit [Petitioner] in jail and confer with [him] about whether he wanted to attend the deposition.    Counsel never informed [Petitioner] he had the right to be present at the deposition."    (Doc. 2 at 20.)    Petitioner raised a similar claim in his first (amended) Rule 3.850 Motion, where he argued that he did not waive his right to be present at Mr. Osterhout's deposition.    (Doc. 16-3 at 368.)    The postconviction court held an evidentiary hearing on the claim.    At the hearing, Petitioner testified that he did not waive his presence at the video deposition.    (Id. at 430.)    However, the State questioned Counsel about whether Petitioner had waived his right to be at Mr. Osterhout's deposition:

> Q. Mr. Tyler's third claim was that you waived Mr. Tyler's presence without his permission in regards to the deposition to perpetuate testimony; did you discuss with Mr. Tyler the motion to perpetuate testimony?

A. Yeah. They had a - - I think it was a paramedic, Osterhout or something like that, that was going to be testifying at the trial, and he had been brought in to testify. He was working for IBM at the time, no longer employed with EMS, and was going to have to return to work or something, wasn't going to be available for when the trial took place.

I had already previously taken his deposition, so I explained to Earon they were going to be doing a deposition which would be videotaped for purposes of being presented at trial, which in essence I didn't use the term, I don't think, perpetuate testimony, but I explained to him that this would be in lieu of his appearing, and that because of that, he's got the right to confront witnesses, he could be present if he desired to do so, if he did not want to be present he did not have to be there for it, I could explain to him what the person testified to, and that it would be his decision to make.

Q. Did he make a decision?

A. Yeah, he told me he didn't want to be there.

Q. Did he tell you why he didn't want to be there?

A. He didn't go into detail about why, he said basically he didn't see no reason for him to be there.

Q. Did Mr. Tyler make a knowing waiver of what he was doing?

A. Yeah, he understood exactly what we were talking about, we sat and had a conversation about it.

Q. Therefore it was an intelligent waiver?

A. He understood completely what was going on, said he didn't need to be there.

Q. You didn't threaten him, coerce him or anything to get him to say he's not going to be there?

A. No. Every time anything was done during the course of the trial, Earon and I would discuss in detail what his options were.   I gave him copies of everything, explained what we were doing at all times.   Earon was completely aware of every aspect of what transpired, and he said he didn't need to be there.

Q. Did you threaten Mr. Tyler so he'd waive his presence?

A. No.

Q. Was his waiver a verbal response or did he speak to you and say he didn't want to be there?

A. We had a discussion, he said he didn't want to be there.

(Id. at 498–500.)   After the hearing, the postconviction court found Counsel's testimony more credible than Petitioner's and concluded that Petitioner had waived his right to be present at EMT Osterhout's video deposition.   (Doc. 16-4 at 2.)

A federal habeas court has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434 (1983); see also Consalvo v. Sec'y, Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011) ("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review.").   Thus, this Court accepts that Petitioner told Counsel that he waived his right to be present at Mr. Osterhout's video deposition.   And under both Florida law and the Constitution, Petitioner's discussion with Counsel on this issue was sufficient to protect his rights.   See State v. Singletary, 549 So. 2d 996, 997 (Fla. 1989) ("During the course of a criminal trial, defense counsel necessarily makes many tactical decisions and procedural decisions which impact upon his client.   It is impractical and unnecessary to require an on-the-record waiver by the defendant to anything but those rights which go to the very heart of the adjudicatory process, such as the right to a lawyer."); Wainwright v. Sykes, 433 U.S. 72, 93 (1977) (Burger, C.J., concurring) ("The trial process simply does not permit

the type of frequent and protracted interruptions which would be necessary if it were required that clients give knowing and intelligent approval to each of the myriad tactical decisions as a trial proceeds." (footnote omitted)).    Counsel was not ineffective for failing to do more than ensure that Petitioner waived his right to attend Mr. Osterhout's deposition.    And given that Petitioner waived his right to attend, it is difficult to see how he was prejudiced from the lack of an on-the-record waiver of his right to be there.

Petitioner has satisfied neither <u>Strickland</u> prong, and this claim is not substantial.    Thus, Petitioner's default of these claims is not excused under <u>Martinez</u>.    Grounds Two (B) and Two (C) are dismissed as unexhausted and procedurally barred from consideration.    Alternatively, the claims are denied on the merits.    28 U.S.C. § 2254(b)(2).[9]

### H.    Ground Two (D) and Ground Two (E)

In Ground Two (D), Petitioner asserts that "Counsel was ineffective for not calling paramedics Sally Platt and David Dixon as witnesses to refute Osterhout's testimony that Tyler had confessed to robbing the store."    (Doc. 2 at 21.)    In Ground Two (E), Petitioner asserts that Counsel was ineffective for "not eliciting on

---

[9] If Grounds Two (B) and Two (C) were intended to challenge the postconviction court's rejection of Ground Three in Petitioner's Rule 3.850 Motion (and the subsequent silent affirmance by the Second DCA (Doc. 16-5 at 106)), he is not entitled to relief.    The Court concludes that the state postconviction court's rejection of the claim on the ground that "Petitioner waived his appearance [at EMT Osterhout's deposition] and chose not to attend" (Doc. 16-4 at 2–3) was neither contrary to clearly established federal law nor based upon an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing.    28 U.S.C. § 2254(d).

cross-examinations of paramedic Clayton Boggess and Deputy Sam Williamson testimony that would refute Osterhout's deposition that [Petitioner] had confessed to robbing the store." (Id. at 21–22.) Petitioner asserts that the other witnesses would have testified that Petitioner was "thrashing around" in the ambulance and did not witness his confession to EMT Osterhout. (Id. at 22–23.)

EMT Osterhout's video deposition was played at the trial. (Doc. 16-2 at 361–63.) Mr. Osterhout testified that—to ensure his and his partner's safety—he asked a "series of questions to the patient," including whether Petitioner had been "robbing the store." (Doc. 16-2 at 58.) Petitioner answered affirmatively with "a nod of the head, looking [Mr. Osterhout] in the eye, indicating to me that, in fact, he was." (Doc. 16-2 at 58.) Mr. Osterhout testified that Petitioner appeared to understand the question "very clearly." (Id. at 59.) Mr. Osterhout said that nobody was in the back of the ambulance with them during these questions. (Id. at 59–60.)

In his first Rule 3.850 motion, Petitioner argued that Counsel was constitutionally ineffective for failing to call David Dixon. Sally Platt, and Clayton Boggess as defense witnesses to refute Osterhout's testimony regarding Petitioner's confession. (Doc. 16-3 at 373.) The postconviction court denied the claim after an evidentiary hearing. (Doc. 16-4 at 3–4.) The court noted that after consideration of the overwhelming evidence of Petitioner's guilt, Counsel's "strategic decision not to highlight Petitioner's statement to E.M.T. Osterhout [was] quite understandable and would not have changed the jury verdict of this case[.]" (Id. at 4.) The Second

DCA affirmed without a written opinion.   (Id. at 106.)   The Court's review of the

record supports the state courts' rejection of this claim.[10]

At the evidentiary hearing on Petitioner's Rule 3.850 Motion, the state

questioned Counsel about why he chose not to call EMT Dixon to impeach Mr.

Osterhout's testimony:

> Q. [Petitioner's] last claim is you failed to call Mr. Dixon to
> impeach the testimony of Osterhout with the testimony of
> Mr. Dixon; can you tell us today why you didn't call Mr.
> Dixon to testify?
>
> A. The worse part about the case, as I said, is from [Petitioner]
> being found at the scene and obviously the run report that
> was written by Osterhout which he said that Earon had
> admitted to being involved in the robbery.
>
> I don't remember exactly what the terminology was as far as
> whether or not he was indicating Earon had said that he had
> committed the robbery or was there when the robbery took
> place, but there was a statement on the run report to the fact
> that Osterhout had discussed with Earon the robbery.
>
> And here it is, "States he has pain in abdomen, he was
> robbing the store," according to the deposition and statement
> of Osterhout, I guess it was for his safety and for anybody
> else, he wanted to find out, you know, what, if any,
> involvement Earon had, whether he had weapons on him, et
> cetera, and interviewed him.
>
> When Osterhout was questioned, he indicated that when the
> statement was made by [Petitioner] to him it was about the
> time that he had put the oxygen mask on.   He'd either taken

---

[10] Petitioner raised a similar claim in his first section 2254 petition, and
Judge Steele denied the claim on the ground that "the trial court's [rejection of the
claim] [was] not contrary to or an unreasonable application of federal law, nor is it
an unreasonable determination of facts in light of the evidence presented in the
State court.   The state court correctly applied the Strickland standard to
Petitioner's ineffective assistance of counsel claim and found counsel's decisions did
not prejudice Petitioner in light of the 'overwhelming' evidence presented to the
jury."   (Doc. 16-4 at 357.)

it off or somehow had the ability to communicate with Earon when Earon either made the statement or acknowledged to the paramedic he was somehow involved.

There was also a deposition that had been taken, I don't know, a year or so earlier, of Dixon, wherein Dixon indicated he got there later, got there afterwards, but that he had gone to where the deceased was first and that it was, in fact, Osterhout who had taken care of Earon.   I asked Osterhout whether anybody else was present at the time that Earon made the statement, he said, no, it was just Earon and himself.

Quite frankly, I considered this to be pretty incriminating. Obviously, I did not want to make this the highlight of the trial by getting into an argument.   If I recall correctly, Dixon signed this statement as well.

The other problem too, is that if -- you know, we were hoping to try to make something of the fact that maybe because of his injury, his concern for his well-being and his health, et cetera, that there may have been some miscommunication, et cetera, on the run report.   It indicates, I guess, the Glasgow index that he was a 15, which indicates that he was very alert and aware, understood what was going on.

I didn't have Dixon come in, who signed the report, and emphasized again that it was a fact he had testified that he was incoherent when he made contact with him, but again, he had signed the run report indicating that he was a 15 on the Glasgow scale, and he was oriented times three, which meant that he was perfectly aware what was going on.   I did not, again, want to get into making this thing the highlight of the trial.

Q.  So basically what you had is you had testimony of one witness who said he was alone when the statement was made, and Mr. Dixon didn't arrive or wasn't there the whole time?

A.  Well, Dixon stated in the end of his deposition that he got there later, which suggested to me that probably what happened is the statement had been made by the time he got there, given Osterhout had already said that statement was made to him when he was alone. And I knew that if I called

> him as a witness, Mr. Collins would have had an opportunity
> to question Dixon about the run report and we would have
> gone through the whole thing again. I felt like it was not
> worth risking, I didn't know what Dixon was going to say
> when confronted with that in trial, it was better off moving
> on.

(Doc. 16-3 at 500–03.)    It is clear from this exchange that Counsel made a strategic decision not to draw attention to Petitioner's confession by questioning other EMTs or law enforcement about what they witnessed.    "[A] court should be highly deferential to those choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy."    Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993).    Counsel's reasoning concerning EMT Dixon applies equally to the other witnesses named in these grounds.    Namely, Counsel did not want to draw attention to Petitioner's confession by arguing with the EMTs or law enforcement officers at trial about what they did not hear.    Given that Mr. Osterhout specifically testified that nobody else was present when he asked Petitioner if he was robbing the store, questioning other witnesses about Petitioner thrashing about or arguing with them about whether Mr. Osterhout was alone with Petitioner long enough to elicit a confession would not have impeached Mr. Osterhout's testimony; to the contrary, it would have served little purpose other than calling attention to the confession.    Thus, Counsel's strategic decision not to call Sally Platt, David Dixon, Clayton Boggess, or Sam Williamson to testify that they did not hear or otherwise witness the confession was not unreasonable and was certainly not an error "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."    Strickland 466 U.S. at 687

(internal quotation marks omitted).   To the extent this claim was exhausted, the state court's rejection of the claim was neither contrary to clearly established federal law nor based upon an unreasonable determination of the facts.   As to Petitioner's unexhausted claims, none are substantial, and Petitioner's default of these claims is not excused under <u>Martinez</u>.   Petitioner is not entitled to federal habeas relief on Ground Two (D).

## I.   Ground Two (F)

Petitioner asserts that Counsel was constitutionally ineffective for allowing a videotape of EMT Osterbout's deposition to go to the jury room.   (Doc. 2 at 26.) He asserts that because they could watch the video as much as they wanted, the jury had greater access to Mr. Osterbout's testimony than to that of the other witnesses.   (Id.)   Petitioner argues that Rule 3.400(a)(4) of the Florida Rules of Criminal Procedure prohibits depositions from being taken to a jury room, and that the jury may have watched the deposition and used it to inform their decision to find Petitioner guilty.   (Doc. 25 at 22.)

Respondent argues that Petitioner cannot demonstrate <u>Strickland</u> prejudice from the presence of the video in the jury room because "there is nothing in the record to indicate that the jurors viewed the videotape during their deliberations." (Doc. 16 at 47.)   Indeed, Petitioner provides no evidence that the jury watched the video or that, even if they did, hearing Mr. Osterhout's testimony a second time changed the outcome of the trial.   In short, Petitioner merely speculates that the jury's access to the video could have changed the outcome of his trial.   Petitioner counters that Respondent only speculates that the jury did not watch or base its

opinion on the deposition video.   (Doc. 25 at 22.)   However, this argument relies on a mistaken understanding of the burden of proof on habeas review.   As noted, in an ineffective assistance claim, Petitioner, not the state, has the burden to show a reasonable probability that the result would have been different if Counsel had objected to the deposition video being placed into evidence.   See Wong, 558 U.S. at 27.   And here, we simply do not know whether the jury viewed the video in the deliberation room or whether it had any influence on their decision to find Petitioner guilty.[11]   And "when we do not know[,] the party with the burden loses[.]"   Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006).

On this record, Petitioner cannot demonstrate Strickland prejudice.   Thus, Ground Two (F) is not substantial, and Petitioner's default of this claim is not excused under Martinez.   Thus, Ground Two (F) is dismissed as unexhausted and procedurally barred from consideration.   Alternatively, the claim is denied on the merits.   See 28 U.S.C. § 2254(b)(2).

**J.    Ground Three**

Petitioner asserts that he was denied a fair trial due to the cumulative prejudice of Counsel's deficient performance.   (Doc. 2 at 31.)   Petitioner has not established prejudice as to any individual claim or the collective effect of any deficient performance on the trial.   See Morris v. Sec'y, Dep't of Corr., 677 F.3d

---

[11]   In light of the overwhelming evidence of Petitioner's guilt, including eyewitness testimony and the deposition video that was already played at trial, it is difficult to see how the presence of the deposition video—even if viewed a second time—had any effect on the verdict.   See also discussion supra at Part III(D) at footnote 8.

1117, 1132 (11th Cir. 2012) (rejecting claim of cumulative error since "none of [Petitioner's] individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate").

In all events, absent Supreme Court precedent applying the cumulative error doctrine to IAC claims, the state court's denial of the claim was not contrary to, or an unreasonable application of, clearly established federal law.   See Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 565 (11th Cir. 2009).   Petitioner is not entitled to federal habeas relief on Ground Three.

## IV.    Conclusion

Based on the foregoing, Petitioner is not entitled to relief on any habeas claim presented here.

Accordingly, it is **ORDERED** that:

1.    Each claim in the amended 28 U.S.C. § 2254 petition filed by Earon LaShawn Tyler is either dismissed as unexhausted, denied on the merits, or both. Thus, the petition is **DENIED**.

2.    The Clerk is **DIRECTED** to enter judgment in favor of Respondent and against Petitioner, deny any pending motions as moot, terminate any deadlines, and close this case.

## Certificate of Appealability[12]

---

[12]  Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court or circuit justice or judge must first issue a certificate of appealability (COA).  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make this substantial showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,"  Slack v. McDaniel, 529 U.S. 473, 484 (2000), or that "the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).  When, as here, the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack, 529 U.S. at 484.

Upon consideration of the record, the Court declines to issue a COA. Because Petitioner is not entitled to a COA, he is not entitled to appeal in forma pauperis.

**DONE AND ORDERED** in Fort Myers, Florida on September 9, 2025.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record